IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL RICHARD SANCHEZ, JR.,<br><br>　　　　　　Petitioner,<br><br>vs.<br><br>KELLY HARRINGTON, Warden, Kern Valley State Prison,<br><br>　　　　　　Respondent. | No. 2:10-cv-00737-JKS<br><br>MEMORANDUM DECISION |

　　　　Paul Richard Sanchez, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Sanchez is currently in the custody of the California Department of Corrections and Community Supervision, incarcerated at the Kern Valley State Prison.  Respondent has answered and Sanchez has replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

　　　　Following a jury trial, Sanchez was found guilty of two counts of Robbery under California Penal Code § 211, three counts of Attempted Robbery under California Penal Code §§ 664 and 211, and one count of Assault with a Deadly Weapon under California Penal Code § 245(a)(1).  The jury also found true that Sanchez had personally used a knife during commission of several of the offenses.  In a bifurcated trial the court found Sanchez had five prior "strikes," and sentenced Sanchez to an aggregate prison term of seventy-seven years to life. The California Court of Appeal, Third Appellate District, affirmed Sanchez's conviction and

sentence in an unpublished decision,[1] and the California Supreme Court denied review on February 25, 2009.  Sanchez timely filed his Petition for relief in the Northern District of California on February 22, 2010, which transferred the case to this Court.

The facts underlying Sanchez's conviction are well known to the parties, recited in detail by the California Court of Appeal, and unnecessary to an understanding of this decision. Accordingly, they are not repeated here.

## II.  GROUNDS RAISED/DEFENSES

In his Amended Petition Sanchez raises two grounds, arguing that the trial court erred by denying: (1) his *Marsden* motion;[2] and (2) his motion to exclude the identification testimony of the witnesses.  Respondent asserts no affirmative defense.[3]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[1] *People v. Sanchez*, No. C057286, 2008 WL 5331301 (Cal. Ct. App. Dec. 22, 2008).

[2] The term "*Marsden* motion" comes from *People v. Marsden,* 465 P.2d 44, 47-48 (Cal. 1970), a California Supreme Court case that held that, as part of a criminal defendant's right to effective assistance of counsel under the Sixth Amendment, a trial judge must permit a defendant requesting substitute counsel the opportunity to present his reasons for the request, *i.e.*, evidence and argument to establish that he is receiving ineffective assistance of counsel.

[3] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

proceeding."[4]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[5]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[6]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[7]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[8]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[9]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

---

[4] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[5] *Williams*, 529 U.S. at 412 (alteration added).

[6] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[7] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[8] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[9] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

3

the trial with unfairness as to make the resulting conviction a denial of due process.'"[10]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[11]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[12]

> The Supreme Court recently underscored the magnitude of the deference required:
>
> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[13]

---

[10] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[11] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[12] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[13] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[14] State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[15] This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[16]

## IV.  DISCUSSION

Ground 1:  Denial of *Marsden* Motion

Prior to the preliminary hearing, Sanchez made a *Marsden* motion in which he requested his appointed counsel be replaced by another attorney appointed by the court. Following a closed hearing, the trial court denied the motion. As he did on direct appeal, Sanchez contends that his *Marsden* motion was improperly denied. Specifically, Sanchez contends that the trial court abused its discretion and denied Sanchez his Sixth Amendment right to the counsel of his choice. The California Court of Appeal disagreed, stating:

> [Sanchez] contends his *Marsden* motion was improperly denied. We disagree.

---

[14] *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[15] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[16] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

5

A defendant is entitled to have his or her appointed counsel replaced if the record clearly shows that counsel is not providing adequate representation or that the defendant and counsel have become so embroiled in conflict that ineffective representation will likely result.

Here, prior to the preliminary examination, [Sanchez] made a *Marsden* motion requesting substitution of his assigned public defender, John Roth. [Sanchez] explained that although he had spoken with Roth during the brief period since Roth had taken over his case, Roth had not visited him in jail as promised. [Sanchez] further complained that Roth could not explain why the People were refiling previously dismissed charges against him.

Roth responded that he had just been assigned to [Sanchez's] case three weeks earlier and had been unable to meet with [Sanchez] in person because of a heavy trial calendar. However, Roth explained, he had reviewed nearly 900 pages of discovery, spent "a couple hours" reviewing "twelve to thirteen CD's of information," and was prepared to go forward with the preliminary hearing. Roth explained that he did not have any documentation indicating why the previously dismissed charges were being refiled but could surmise several possible reasons based on his review of the record; however, he had not had time to explain that to [Sanchez] because of the timing of the *Marsden* motion.

Given Roth's review of the discovery and the fact that he was prepared to commence with the preliminary hearing, the court inquired whether Roth would be able to visit [Sanchez] at jail within the week. Roth conferred with [Sanchez] and responded affirmatively. At [Sanchez's] request, and subject to the People being given an opportunity to object, the court granted a short delay in the proceedings to permit Roth and [Sanchez] time to meet prior to the preliminary hearing. In the end, the court ruled there had not been "such a breakdown in the relationship between [Sanchez] and Mr. Roth that it would be impossible for Mr. Roth to properly represent [Sanchez]." Noting that Roth had "only been in the case fifteen days" and had not been able to meet with [Sanchez] at the jail because of "his trial schedule and other court deadlines," the court denied the motion, giving [Sanchez] and Roth time to meet outside the presence of the court prior to commencement of the preliminary hearing.

We review for abuse of discretion the trial court's denial of a *Marsden* motion and will find such an abuse only where the defendant has shown that the failure to replace appointed counsel would substantially impair his or her right to assistance of counsel. We find no error.

During the three-week period after being assigned to [Sanchez's] case, Roth reviewed a significant amount of discovery in order to familiarize himself with the matter. While he admittedly had not been to the jail to visit with [Sanchez] in person, he was prepared to meet with him prior to the preliminary hearing and explain why previously dismissed charges were being refiled. [Sanchez] agreed to proceed in that manner, meeting with Roth prior to the preliminary hearing and going forward with the preliminary hearing without further complaint. From that, we infer the relationship between client and counsel was still intact and functioning. We note that

6

> while the record reflects a second *Marsden* request by [Sanchez] at the April 19, 2007, pretrial hearing, the court continued the matter because of defense counsel's absence, and according to the court's April 26, 2007, minute order, the *Marsden* motion was "drop[ped]." We infer from that course of events that any problem between client and counsel was resolved to [Sanchez's] satisfaction.
>
> On the record before us, [Sanchez] has not shown that Roth provided inadequate representation or that, at the time of the *Marsden* hearing, he and Roth were so embroiled in conflict that ineffective representation was likely. Accordingly, [Sanchez] has failed to demonstrate an abuse of discretion in the denial of his *Marsden* motion.[17]

First, this Court notes that the right to counsel of one's choice is a qualified right that applies only to people who can afford to retain counsel.[18] In this case, the issue is neither Sanchez's right to choice of counsel nor a denial of counsel. The Supreme Court has "reject[ed] the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."[19] Instead, the constitutional question is whether the conflict between Sanchez and his attorney prevented effective assistance of counsel.

> Thus, the ultimate constitutional question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding Schell's motion, but whether this error actually violated Schell's constitutional rights in that the conflict between Schell and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.[20]

---

[17] *People v. Sanchez*, No. C057286, 2008 WL 5331301, at *4-5 (Cal. Ct. App. Dec. 22, 2008) (citations omitted).

[18] *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)) ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."); *Schell v. Witek*, 218 F.3d 1017, 1025-26 (9th Cir. 2000) (en banc).

[19] *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

[20] *Schell*, 218 F.3d at 1026.

Here, Sanchez expressed nothing more than a general sense of dissatisfaction with his attorney's performance, not any conflict, irreconcilable or otherwise. This Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[21] Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Sanchez's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable. Sanchez is not entitled to relief under his first ground.

Ground 2:  Identification Evidence

Sanchez contends the trial court erred by denying his motion to exclude the field and subsequent in-court identifications by two witnesses, Oscar and Applegate. The field identification procedure was described by the Court of Appeal as follows:

> Sheriff's Deputy Stacey Lonteen, who had been involved in the Taco Bell robbery investigation two days before the Arby's incident and responded to Deputy Fisher's request for assistance, recognized [Sanchez] from the Taco Bell video surveillance tape. Lonteen contacted Oscar and Applegate and summoned them to the location for a possible field identification. Applegate arrived first and was admonished that the individual she was about to see might or might not have been involved in the earlier Taco Bell robbery and might have changed his physical appearance; she was further advised to remain objective. Applegate said, "Yeah, that looks like him. I'm almost positive."
> Oscar arrived shortly after Applegate left and was similarly admonished by Lonteen. Oscar said that based on his build, [Sanchez] looked like the person who had robbed the Taco Bell. She noted that while she had been unable to get a good

---

[21] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

8

look at the perpetrator's face at the time of the robbery, she was pretty sure [Sanchez's] physical build matched that of the robber. At trial, Oscar testified she was "[p]retty certain" the suspect's build matched that of [Sanchez].[22]

Sanchez contends that the identification procedure, a single person showup, was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. The California Court of Appeal rejected Sanchez's arguments, stating:

> We exercise our independent judgment in reviewing a trial court's ruling on the identification procedure. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.) We first consider "whether the identification procedure was unduly suggestive and unnecessary." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) In determining whether the procedure was unduly suggestive, "'[t]he question is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.'" (*Id.* at p. 990.) If the lineup was unduly suggestive and unnecessary, then we consider "whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ." (*Id.* at p. 989.) If unreliable under this test, we reverse only if there is a "'substantial likelihood of irreparable misidentification.'" (*Id.* at p. 990.)
> 
> [Sanchez] claims the field identifications were "unduly suggestive" because the witnesses were preconditioned to identify the person in custody when they were told they were being summoned to identify a possible subject involved in the Taco Bell robbery, and [Sanchez] was handcuffed and in the presence of numerous police officers and marked patrol cars when the witnesses arrived. [Sanchez] argues further that the field identifications were unnecessary because the Taco Bell robbery had taken place two days earlier, and given that his arrest for the Arby's robbery was inevitable, there was no exigency and therefore no reason not to wait for a more formal photographic "six-pack" or jail lineup. In any event, he argues, the field identifications by Oscar and Applegate were not reliable under the totality of the circumstances because neither witness was able to get a good look at [Sanchez] (i.e., Oscar did not see the robber's face and Applegate "never saw him from the front") and both relied on [Sanchez's] build and body shape to identify him. We disagree.
> 
> Here, both Oscar and Applegate were summoned to the field show-up by Deputy Lonteen. The witnesses arrived separately and were never present at the location at the same time. Neither witness spoke to the other prior to the identification. Both witnesses were similarly admonished to keep an open mind and told that the individual shown might or might not have been involved in the Taco Bell robbery. Applegate was "almost positive" [Sanchez] was the robber. Oscar was "pretty sure" [Sanchez's] build matched that of the robber. While it is true that every

---

[22] *Sanchez*, 2008 WL 5331301 at *4.

9

field identification is inherently suggestive, "[t]he potential unfairness in such suggestiveness, however, is offset by the likelihood that a prompt identification within a short time after the commission of the crime will be more accurate than a belated identification days or weeks later. Because the problem is inherent in such confrontations, the choice is between prohibiting all in-the-field identifications or permitting them notwithstanding the element of suggestiveness. The choice involves a balancing of the interests of fairness to criminally accused persons and prompt, proper and efficient law enforcement, and the choice has properly been made to permit in-the-field identifications, because the immediate knowledge whether or not the correct person has been apprehended is of overriding importance and service to law enforcement, the public and the criminal suspect himself." (*People v. Odom* (1980) 108 Cal.App.3d 100, 110.) We do not find the field identifications to have been unduly suggestive, nor do we find them to have been unnecessary given the similarity between the two robberies and the fact that one was committed just two days after the other, the second being in relatively close proximity to the first.

In any event, even if we were to determine that the field show-up procedure was suggestive, we would still conclude that the identification was reliable under the totality of the circumstances. Oscar could not see [Sanchez's] face during the robbery; however, she had plenty of time to observe what he was wearing and assess his build, despite the fact that she was admittedly afraid and did not want to look at him. Her recollection of [Sanchez's] clothing, size, and shape was, as it turns out, accurate. Although Oscar was not absolutely certain [Sanchez] was the robber, she was "pretty sure" based on his build.

To the extent Oscar's identification may have been equivocal, Applegate's identification of [Sanchez] was not. Applegate saw the robber standing behind Oscar, then observed him as he walked out from behind the counter and right past her to exit the restaurant. She identified him as "Hispanic, about six feet tall," with a "large build" and "a thick, muscular neck," probably weighing 200 pounds. She noted he wore a white beanie that covered most of his hair, but he had short black sideburns. She described him as unshaven, with a thin mustache, wearing a black T-shirt and light-colored blue jeans. Although she only saw his face from the side, Applegate confirmed she "could definitely recognize him" if she saw him again. As for both witnesses, we note that the fact that the field identifications occurred two days after the Taco Bell robbery did not appear to dull either witness's memory or impair her ability to recognize and identify [Sanchez]. We find the field identifications by Oscar and Applegate to be reliable under the totality of the circumstances here.

[Sanchez] argues he was prejudiced by admission of the field identifications, speculating that Applegate's identification of him at the field show-up made it "unlikely that she would retract" her identification at trial regardless of her degree of certainty. [Sanchez] also concludes, without reasoning or authority, that "this Court cannot say beyond a reasonable doubt" that he would not have obtained a more favorable result in the absence of those identifications. Indeed, as the People accurately point out, [Sanchez] took full advantage of the opportunity to cross-examine both Oscar and Applegate, as well as the deputies involved in the field

10

show-ups. He presented expert testimony related to the inaccuracies of eyewitness identifications. We also note that, in addition to the field and in-court identifications, the jurors were shown portions of the surveillance videotape from the Taco Bell robbery and were able to draw their own conclusions from that evidence. Given the other evidence in the case, including the items found in the car in which [Sanchez] was apprehended, any possible error in admitting the identification was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711].)[23]

Analysis starts with the rule that due process is violated when an identification procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification."[24] The Supreme Court, although acknowledging that showing suspects individually to persons for the purpose of identification and not as part of a lineup was widely condemned, has declined to adopt a *per se* rule prohibiting the practice. Instead, it has adopted a rule that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it."[25] The Supreme Court has further stated:

> [E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[26]

Determining whether an identification is so-flawed as to require its exclusion is a two-step process. The first inquiry is whether the identification process was "unnecessarily

---

[23] *Id.* at *5-6.

[24] *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987).

[25] *Id.*

[26] *Simmons v. United States*, 390 U.S. 377, 394 (1968).

11

suggestive."[27] The second is whether, "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."[28] "[R]eliability is the linchpin in determining the admissibility of identification testimony,"[29] and thus even an unduly suggestive identification may satisfy due process if it was nevertheless reliable. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[30]

Applying these principles to this case, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[31] Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Sanchez's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more

---

[27] *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Stovall,* 388 U.S. at 302 ("[A] showup identification violates due process only if it is an '*unnecessarily* suggestive' procedure." (emphasis original)).

[28] *Biggers*, 409 U.S. at 199.

[29] *Manson v. Braithewaite*, 432 U.S. 98, 114 (1977).

[30] *Biggers*, 409 U.S. at 199-200.

[31] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable. Sanchez is not entitled to relief under his second ground.

## V.  CONCLUSION AND ORDER

Sanchez is not entitled to relief on either ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[32] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[33]

The Clerk of the Court is to enter judgment accordingly.

Dated:  March 27, 2012.

　　　　　　　　　　　　　　　　　　　　/s/ James K. Singleton, Jr.
　　　　　　　　　　　　　　　　　　　　JAMES K. SINGLETON, JR.
　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[32] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[33] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.